**THIRD DIVISION**
**DOYLE, P. J.,**
**REESE, J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 9, 2022**

# In the Court of Appeals of Georgia

A22A0493. SEALS v. MAJOR et al.

DOYLE, Presiding Judge.

In this action stemming from an alleged partnership agreement, Plaintiff E. Lamar Seals, Jr. (through his power of attorney Lorri Swords) appeals from the grant of summary judgment to defendants Donata Russell Major, Herman Jerome Russell, Jr., Joia Mishaaron Johnson, and Eddie B. Bradford (as executors of the estate of Herman J. Russell); H. J. Russell & Company ("the Russell Company"); and Russell Realty Limited Partnership (collectively "Russell Defendants"). Because the trial court erred by ruling that the record contains no genuine issue of material fact with respect to the formation of a partnership between Seals and the Russell Defendants, we reverse.

"On appeal from the grant of summary judgment this Court conducts a de novo review of the evidence to determine whether there is a genuine issue of material fact and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law."[1]

The factual history is largely undisputed and shows that in October 1980, Herman Russell, Jr., and the Russell Company entered into a written agreement with Seals, a former regional administrator for the U. S. Department of Housing and Urban Development. That agreement ("Seals Agreement") provided:

> We, the UNDERSIGNED, Herman J. Russell, H. J. Russell and Company[,] and Lamar Seals, hereby set down in writing our agreement to develop the captioned project into an FHA Insured Multifamily Housing Project with Section 8 assistance payments.
>
> All funds derived as general partners pursuant to Sections 6.2, 6.5 and 6.6 of the Partnership Agreement (hereinafter identified) shall be paid to Herman J. Russell and/or H. J. Russell and Company and shall thereafter be allocated and paid as follows:

---

[1] (Punctuation and citation omitted.) *Home Builders Assn. of Savannah v. Chatham County*, 276 Ga. 243, 245 (1) (577 SE2d 564) (2003), quoting *Youngblood v. Gwinnett Rockdale &c.*, 273 Ga. 715, 717 (4) (545 SE2d 875) (2001) and *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

2

1. A. The funds accruing to Herman J. Russell and/or H. J. Russell and Company pursuant to Section 6.2, Section 6.5 and Section 6.6 of that certain Limited Partnership Certificate and Agreement for Bedford Tower Apts., Ltd. ["the Russell Agreement"], dated October 15, 1980, and filed for record in Book 180 at page 245 in the official records of Fulton County, Georgia, shall be divided and allocated as follows:

1. Herman J. Russell 50%

2. Lamar Seals 50%

2. Herman J. Russell and H. J. Russell and Company shall have no liability to the undersigned for any payments made by them in good faith pursuant to this agreement, or pursuant to the Partnership Agreement or Development Agreement for this project.

3. Any liability accruing as a result of the project or as a result of being a General Partner of the project shall be borne by each of the undersigned to the same extent as the percentage allocation of profits as set forth in Paragraph 1 above.

This sets forth our entire agreement concerning the captioned project.

On or about the same day, the Russell Agreement was executed by Herman J. Russell, the Russell Company, and Sulgrave Realty Corp. In relevant part, the Russell Agreement provided that the purpose of the partnership was to "acquire, own and

hold certain real property . . . and to build and develop . . . and to own and operate an apartment project ["Bedford Towers"]. . . in which 100 [percent] of the apartment units will be eligible for housing assistance payments pursuant to the provisions of Section 8 of the U. S. Housing Act of 1937."[2] With respect to the parties to the Russell Agreement, Russell and the Russell Company were named as general partners and were solely responsible for managing the business and the Bedford Towers project. The agreement further provided for certain capital contributions by various classes of partners[3] and certain allocations of money to the partners: Russell and the Russell Company (as general partners) would collectively receive 40 percent of the cash flow[4] (Section 6.2); proceeds of a sale would be allocated under a certain

---

[2] That act provides for certain housing payments on behalf of qualifying low income individuals. See 42 USCS § 1437f (a) ("For the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing, assistance payments may be made with respect to existing housing in accordance with the provisions of this section.").

[3] The Russell Agreement required Russell and his company each to contribute only $500. After certain other parties had been repaid their contribution, Russell and the Russell Company would have a 50 percent interest in the capital of the Russell Agreement partnership.

[4] Article 6 of the Russell Agreement defined "cash flow of the Partnership" as:

the net profits and losses of the Partnership . . . (excluding therefrom profits or losses on the sale, exchange or other disposition of Partnership

4

formula (Section 6.5); and proceeds of refinancing would be allocated under a certain formula (Section 6.6). Net profits were allocated to the executing partners in Section 5 of the Russell Agreement.

It is undisputed that after Seals and Russell executed the Seals Agreement, Seals received regular payments pursuant to the Seals Agreement. In December 1993, Russell formed Russell Realty Limited Partnership that was capitalized in part by Russell's interest in the Russell Agreement. Thereafter, in 2014, Russell died.

In March 2018, the Bedford Towers apartments were sold to an entity called The Residences at Maggie Capitol, LLC, which was owned by companies controlled by Russell and/or his family. No disbursement from the sale was made to Seals in 2018, and Seals was not informed of the sale until he inquired about the status of his distributions in January 2019. Seals was then informed of the sale and presented with

---

property and the proceeds of any refinancing of Partnership property); . . . plus depreciation and [certain tax deductible] construction writedown costs . . . minus [mortgage payments and certain other capital expenses].

Article 5 of the agreement defined "net profits and losses" as: "the net profit or net loss . . . of the Partnership as shown on its books of account after deduction of expenses, depreciation and such other charges or additions as are appropriate."

a check for $856,403.21 on the condition that he sign a proposed release of further obligations with respect to the project.

Seals declined to sign the proposed release without an accounting and more information; he later accepted the $856,403.21 payment but remained unsatisfied without a full accounting and understanding of the financial history and status of the project. Accordingly, Seals filed the present action in December 2019, asserting claims (as amended) for declaratory judgment (later withdrawn), accounting, and damages for breach of fiduciary duty, breach of contract, monies had and received, and attorney fees. Following discovery, Seals moved for partial summary judgment, and the defendants moved for summary judgment on all claims.

The trial court denied Seals's motion and granted the defendants' motion.[5] In relevant part, the trial court ruled that: (a) there was no genuine factual issue as to whether Seals and Russell and the Russell Company had entered into a partnership, (b) the parties otherwise lacked a fiduciary relationship, (c) Seals's money had and received claim failed based on the undisputed evidence, and (d) Seals's breach of contract claim failed based on the undisputed evidence and contractual language.

_____

[5] The trial court had earlier denied the defendants' motion to dismiss for failure to state a claim based on the pleadings.

6

1. Seals first contends that the trial court erred by ruling as a matter of law that there was no partnership between Seals and the Russell Companies. We agree.

Determining the existence of a partnership "is generally a mixed question of law and fact, and can not be resolved as a matter of law unless the verdict one way or the other is demanded by the evidence."[6]

> Although the question of what will constitute a partnership is a matter of law for the court, in the absence of an unambiguous contract of partnership or of any written articles of partnership, it is a question of fact for the jury to decide, under proper instruction from the court, whether the intention of the parties was to become partners and whether a partnership existed as to third parties at the times in question.[7]

Under OCGA § 14-8-6 (a), "[a] partnership is an association of two or more persons to carry on as co-owners a business for profit. . . ." More specifically, OCGA § 14-8-7 provides:

---

[6] (Punctuation omitted.) *Pope v. Triangle Chemical Co.*, 157 Ga. App. 386, 388 (3) (a) (277 SE2d 758) (1981), quoting *Miraglia v. Gose*, 17 Ga. App. 639 (87 SE2d 906) (1916). See also *Jamal v. Hussein*, 237 Ga. App. 779, 780-781 (1) (515 SE2d 407) (1999) ("Partnership is a mixed question of fact and law.").

[7] (Punctuation omitted.) *Southern Concrete Products Co. v. Robertson*, 129 Ga. App. 46, 48 (198 SE2d 512) (1973) (physical precedent only).

7

In determining whether a partnership exists, the following rules shall apply: . . . *The sharing of gross returns does not of itself establish a partnership*, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived; [and] . . .*[t]he receipt by a person of a share of the profits of a business is prima-facie evidence that he is a partner in the business*; provided, however, that no such inference shall be drawn if profits were received in payment of [certain obligations not at issue here].[8]

Further,

[a] partnership can result from a contract, which may be either express or implied. Factors that indicate the existence of a partnership include a common enterprise, the sharing of risk, the sharing of expenses, the sharing of profits and losses, a joint right of control over the business, and a joint ownership of capital. But the true test to determine whether a partnership has been created is the intention of the parties. The language which the parties used in making the contract is to be looked to in determining what their intention was, which when ascertained will prevail over all other considerations.[9]

Thus, it is the intention of Seals and Russell that must be ascertained.

---

[8] (Emphasis supplied.) OCGA § 14-8-7 (3), (4).

[9] (Punctuation omitted.) *Wimpy v. Martin*, 356 Ga. App. 55, 57 (1) (a) (846 SE2d 230) (2020).

It is undisputed that Seals, who is elderly, is incompetent to testify, and Russell is deceased. The evidence of the parties' intent is primarily the Seals Agreement, which refers to the Russell Agreement; these documents and their context inform the analysis regarding whether the parties intended to enter into a partnership.[10] The context includes the undisputed facts that Seals was a former regional administrator for HUD, and the project sought to comply with HUD regulations regarding a Section 8 low income housing development.

Under the Russell Agreement, Russell and his company were general partners in the original Bedford Tower Apartments development project. Under the Seals Agreement, Russell entered into a separate agreement with Seals, sharing the profit and liability of the general partners as outlined in the Russell Agreement. Notably, the liability Russell shared with Seals extended to "any liability accruing as a result of the project or as a result of [Russell] being a General Partner of the project." Essentially, in exchange for 50 percent of net profits due to Russell and his company,

_____

[10] Lorri Seals, Seals's daughter and power of attorney, is involved in the current operations of Seals's business interests. She deposed that a partnership was formed, but that was based on her reliance on the sharing of profits and liabilities as stated in the Seals agreement.

Seals was accepting half of the liability for the project, explicitly including Russell's liability as a general partner in the Russell Agreement.

As noted above, OCGA § 14-8-7 (4) states that sharing in net profits is prima facie evidence of partnership (absent certain exceptions not applicable here), and the Seals agreement plainly demonstrates shared net profits. So by that fact alone, Seals has put forth prima facie evidence of partnership. But the Seals Agreement goes further, as it refers to and is enmeshed with the Russell Agreement: it establishes the sharing of liability (not merely losses, for example, of capital investment[11]) accruing as a result of the project — specifically "any liability accruing as a result of the project" or as to Russell in his role as a general partner as enumerated in the Russell Agreement. Thus, this is not a case in which there was a mere "sharing of gross returns"[12] and nothing more; there was a sharing of net profits and overall liabilities, specifically those liabilities of a general partner in the development of the project.

---

[11] Compare *Floyd v. Kicklighter*, 139 Ga. 133, 138 (76 SE 1011) (1912) ("[A]n agreement to share profits and losses does not absolutely, and as a matter of law, create a partnership; and if other circumstances in the transaction show that the parties did not intend (in the legal sense heretofore explained) to create a partnership, none is created. The true rule is that such an agreement is merely prima facie evidence of a partnership.").

[12] OCGA § 14-8-7 (3) ("The sharing of gross returns does not of itself establish a partnership. . . .").

Courts have held that parties may be deemed partners based on the structure of their relationship, even if they disclaim partnership in the agreement at issue.[13] Conversely, courts have stated that parties can agree among themselves to establish a partnership "even though [a written] agreement falls short of the facts from which the law would otherwise have inferred a partnership."[14] Thus, it is the relationship intentionally entered into by the parties that reveals their legal status.

There is no material ambiguity in the contractual language as to the underlying obligations of the parties in the Seals Agreement and Russell Agreement. Read together, they create a common enterprise, a sharing of profits, and a sharing of project liabilities and general partner liabilities — and therefore risk — between Seals and Russell that, under applicable law, are sufficient to create a question of fact as to whether they formed a partnership as between themselves. In this context, the fact that the defendants dispute the formation of a partnership is not dispositive on

---

[13] See *Aaron Rents v. Fourteenth Street Venture, L.P.*, 243 Ga. App. 746, 748 (1) (533 SE2d 759) (2000) ("If the parties intend to, and in fact do, enter into [a partnership] contract, they will be partners under the law even though they may have expressly stipulated that they are not partners.").

[14] (Punctuation omitted.) *Accolades Apartments, L.P. v. Fulton County*, 279 Ga. 257, 259 (1) (612 SE2d 284) (2005), quoting *Huggins v. Huggins*, 117 Ga. 151, 156 (43 SE 759) (1903).

summary judgment. Instead, such a dispute is part and parcel of a case not ripe for resolution as a matter of law by the trial court. As noted above, the question of partnership formation is a mixed question of fact and law. Here, the legal questions are not materially disputed — the applicable contract terms are not materially ambiguous as to allocation of profit and risk — but the evidence before us, when viewed favorably to Seals,[15] would support an inference that Seals and Russell had the requisite intention to form a relationship deemed to be a partnership under the law. Based on this record, summary adjudication of this question was not appropriate.[16]

---

[15] See *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459, 459 (486 SE2d 684) (1997) ("A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.").

[16] See *Solomon v. Barnett*, 281 Ga. 130, 131 (636 SE2d 541) (2006) ("Applying our holding in [*Lau's Corp.*, 261 Ga. at 491], we recognize that Barnett, as a named defendant, could prevail at summary judgment under OCGA § 9-11-56 *only by affirmatively disproving* Solomon's claim with his own evidence establishing the absence of any genuine issue of material fact or by showing from the affidavits, depositions and other documents in the record that there was *an absence of evidence* to support at least one essential element of Solomon's claim.") (emphasis supplied). See also *Harrison v. Williams*, 270 Ga. App. 308, 310 (3) (605 SE2d 923) (2004) (summary judgment precluded by factual issues with respect to the legal status of the parties in a contract dispute); *Federal Ins. Co. v. Westside Supply Co.*, 264 Ga. App. 240, 247 (8) (590 SE2d 224) (2003) (factual issues preclude summary judgment).

12

2. Because the question of partnership bears on the questions of fiduciary duty, accounting, money had and received,[17] and breach of contract claims,[18] we likewise reverse the grant of summary judgment as to those claims.

3. Last, we note that the Russell Defendants also contend that the trial court's judgment should be affirmed under the right for any reason rule, citing their trial court argument that Seals's claims do not comply with applicable statutes of limitation. The trial court declined to address these arguments in light of its other holdings.

---

[17] "A claim for money had and received contains the following elements: 'a person has received money of the other that in equity and good conscience he should not be permitted to keep; demand for repayment has been made; and the demand was refused.'" *Wilson v. Wernowsky*, 355 Ga. App. 834, 843 (2) (b) (846 SE2d 101) (2020) (punctuation omitted). The trial court correctly noted that there is an absence of evidence that Seals contributed money to the Russell Defendants, but in light of our holding in Division 1, this claim must be addressed in the context of the remaining legal claims and according to the legal status of the parties: "'An action for money had and received is founded upon the equitable principle that no one ought to unjustly enrich himself at the expense of another, and is maintainable in all cases where one has received money under such circumstances that in equity and good conscience he ought not to retain it.'" Id. at 842 (2) (b). Determining the scope of provable damages under each legal theory is beyond the scope of this opinion.

[18] The Russell Defendants defended the breach of contract claim on the ground that the Seals Agreement stated that the defendants "shall have no liability to [Seals] for any payments made by them in good faith pursuant to this agreement, or pursuant to the [Russell Agreement]." On its face, this does not avoid liability for payments not made, or not made in good faith. Accordingly, the fact that the Russell Defendants later paid overdue amounts to Seals in 2014 does not obviate their liability, if any, for failure to pay other amounts due upon proper proof by Seals.

13

In this situation,

the circumstances of individual appeals must guide the appellate courts as to how best to proceed. In many cases on review of summary judgment, there will be few grounds advanced for summary judgment, with no disputes pertinent to the facts supporting those grounds. In such cases, the more efficient course would be for the appellate court to follow the "right for any reason" rule and consider grounds not addressed by the trial court, if it finds that the trial court's legal analysis is flawed.

In other cases, there may be a variety of grounds advanced, with disputes pertinent to those grounds. In such cases, judicial economy may be maximized by returning the case to the trial court upon the appellate court's discovery that the trial court relied on an erroneous legal theory or reasoning. This would allow the trial court to issue rulings on grounds advanced, which could then serve as a basis for appellate review.[19]

Based on our holdings above, the remaining issues raised in the case, the complexity of the timing and nature of potential damages sought by Seals,[20] and in

---

[19] (Footnote omitted.) *City of Gainesville v. Dodd*, 275 Ga. 834, 838-839 (573 SE2d 369) (2002).

[20] For example, Seals asserts that he would be entitled to certain damages based on the related-party sale of Bedford Towers to Maggie Capitol in 2018, which he was not informed of until 2019.

light of the fact that the trial court has not addressed the defendants' statute of limitation argument, we decline to address it at this time.

*Judgment reversed. Reese, J., and Senior Appellate Judge Herbert E. Phipps concur.*